**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JESUS ALCAZAR,

*Plaintiff,*

and

CESAR ROSAS,

*Plaintiff-Appellant,*

v.

THE CORPORATION OF THE CATHOLIC
ARCHBISHOP OF SEATTLE; HORATIO
YANEZ,

*Defendants-Appellees.*

No. 09-35003

D.C. No.
2:06-cv-00281-RSM

OPINION

Appeal from the United States District Court
for the Western District of Washington
Ricardo S. Martinez, District Judge, Presiding

Argued and Submitted
December 9, 2009—Seattle, Washington

Filed March 16, 2010

Before: Robert R. Beezer, Ronald M. Gould, and
Richard C. Tallman, Circuit Judges.

Opinion by Judge Beezer

4265

**COUNSEL**

Lindsay Halm, Schroeter, Goldmark & Bender, Seattle, Washington, for the plaintiff-appellant.

Karen A. Kalzer, Patterson Buchanan Fobes Leitch & Kalzer, Inc., Seattle, Washington; M. Colleen Kinerk, Cable Langenbach Kinerk & Bauer, LLP, Seattle, Washington, for the defendants-appellees.

**OPINION**

BEEZER, Circuit Judge:

"The First Amendment has erected a wall between church and state. That wall must be kept high and impregnable. We could not approve the slightest breach." *Everson v. Bd. of Educ.*, 330 U.S. 1, 18 (1947). The interplay between the First Amendment's Free Exercise and Establishment Clauses creates an exception to an otherwise fully applicable statute if

the statute would interfere with a religious organization's employment decisions regarding its ministers. *Bollard v. Cal. Province of the Soc'y of Jesus*, 196 F.3d 940, 944, 946-47 (9th Cir. 1999). This "ministerial exception" helps to preserve the wall between church and state from even the mundane government intrusion presented here. In this case, plaintiff Cesar Rosas seeks pay for the overtime hours he worked as a seminarian in a Catholic church in Washington. The district court correctly determined that the ministerial exception bars Rosas's claim and dismissed the case on the pleadings. We have jurisdiction under 28 U.S.C. § 1291,[1] and we affirm.

I

Cesar Rosas and Jesus Alcazar were Catholic seminarians in Mexico. The Catholic Church required them to participate in a ministry training program at St. Mary Catholic Church in Marysville, Washington as their next step in becoming ordained priests. At St. Mary, Rosas and Alcazar allegedly suffered retaliation for claiming that Father Yanez sexually harassed Alcazar, and they eventually sued Father Yanez and the Corporation of the Catholic Archbishop of Seattle ("defendants") under Title VII.[2] In addition, Rosas and Alca-

---

[1]Although this appeal involves only the Washington Minimum Wage Act, we have jurisdiction and properly decide this case. The district court acted within its discretion to dismiss the Washington Minimum Wage Act claim on the merits rather than dismissing the claim under 28 U.S.C. § 1367(c). *See Tritchler v. County of Lake*, 358 F.3d 1150, 1153 (9th Cir. 2004) (noting after Title VII claims were dismissed, the Ninth Circuit still had jurisdiction under 28 U.S.C. § 1291 because the "district court's decision whether to retain jurisdiction over supplemental claims once the original federal claims have been dismissed is reviewed for abuse of discretion"). As the district court dismissed Rosas's Title VII claim under the ministerial exception, it acted within its discretion to dismiss the Minimum-Wage-Act claim under the ministerial exception as well.

[2]After receiving right-to-sue letters from the Equal Employment Opportunity Commission, Rosas and Alcazar sued the defendants under Title VII of the Civil Rights Act, claiming disparate treatment based on gender

zar sued under supplemental jurisdiction for violations of Washington's Minimum Wage Act for failure to pay overtime wages. *See* Wash. Rev. Code § 49.46.130. The district court dismissed the overtime wage claims on the pleadings, *see* Fed. R. Civ. P. 12(c), and Rosas's overtime wage claim is the only issue on appeal.[3]

Because the judgment was on the pleadings, the pleadings alone must be sufficient to support the district court's judgment. We thus base our decision on the very few allegations in Rosas's complaint. Rosas alleges as follows:

> 1.3 . . . The Corporation of the Catholic Archbishop of Seattle hosted [Rosas] as [a] participant[ ] in a training/pastoral ministry program for the priesthood.
>
> . . . .

---

or sexual harassment, and retaliation for complaints about such treatment. The defendants moved to dismiss the Title VII claims and several common law claims. The district court concluded that Alcazar's sexual-harassment claim could proceed but dismissed Rosas's sexual-harassment claim because there was "not a single fact to suggest that Rosas himself was sexually harassed." The district court dismissed all other claims under the First Amendment's ministerial exception. Alcazar's sexual-harassment claim was later dismissed pursuant to a stipulation.

[3]Rosas also argues that the district court erred in denying his motion to amend the complaint. We review a district court's denial of a motion to amend a complaint for an abuse of discretion. *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1087 (9th Cir. 2002). Because the same First Amendment issues arise with respect to a claim under Washington's Minimum Wage Act for failure to pay minimum wage as the failure to pay overtime wages, the district court correctly determined that an amendment to the complaint would be futile. Denial of a motion to amend a complaint after dismissing for failure to state a claim as a matter of law is appropriate where "allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Albrecht v. Lund*, 845 F.2d 193, 195 (9th Cir. 1988).

2.2 Cesar Rosas entered the seminary to become a Catholic priest in 1995 in Mexico.

2.3 As part of [his] preparation for ordination into the priesthood, the Catholic Church required [Rosas] to engage in a ministerial placement outside [his] diocese, under the supervision of a pastor of the parish into which [he was] placed. The Archdiocese of Seattle sends seminarians to Mexico and has Mexican seminarians come to its parishes. [Rosas was] placed in St. Mary Parish in Marysville, Washington under the supervision of defendant Fr. Horatio Yanez.

. . . .

2.10 . . . [Rosas] was hired to do maintenance of the church and also assisted with Mass. He . . . worked many overtime hours he was not compensated for.

## II

We review de novo a district court's order granting judgment on the pleadings. *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 955 (9th Cir. 2004). We must accept as true the allegations in Rosas's complaint and treat as false the allegations in the answer that contradict the complaint. *Id.*

## III

**[1]** The Religion Clauses of the First Amendment provide that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. These clauses require a "ministerial exception" to employment statutes if the statute's application would interfere with a religious institution's employment decisions concerning its ministers. *Bollard*, 196 F.3d at 944, 946-47. Our previous cases focus on Title VII, but our analysis in

those cases compels the conclusion that the ministerial exception analysis applies to Washington's Minimum Wage Act as well.[4]

Here, as in the Title VII context, we first examine whether the Minimum Wage Act implicates the Free Exercise Clause. We must balance:

> (1) the magnitude of the statute's impact upon the exercise of the religious belief, (2) the existence of a compelling state interest justifying the burden imposed upon the exercise of the religious belief, and (3) the extent to which recognition of an exemption from the statute would impede the objectives sought to be advanced by the state.

*Werft v. Desert Sw. Annual Conference of the United Methodist Church*, 377 F.3d 1099, 1102 (9th Cir. 2004) (per curiam) (quoting *Bollard*, 196 F.3d at 946). The goals of Washington's Minimum Wage Act represent a compelling state interest. Wash. Rev. Code § 49.46.005 (noting that minimum wage is a "subject of vital and imminent concern to the people of [Washington]"); *Drinkwitz v. Alliant Techsystems, Inc.*, 996 P.2d 582, 586-87 (Wash. 2000). Likewise, it would impede Washington's goal of ensuring "minimum standards of employment within the state of Washington" to exempt ministers from Washington's Minimum Wage Act. Wash. Rev. Code § 49.46.005.

---

[4]Rosas argues that the district court erred by applying the ministerial exception, which we have recognized in the Title VII context, to this state statutory regime without specifically balancing the Free Exercise Clause and Establishment Clause factors. Such a balancing was unnecessary, however, as our precedent holds that the ministerial exception applies to state statutes that interfere with the church-minister relationship. *See Werft*, 377 F.3d at 1100 n.1; *Bollard*, 196 F.3d at 950. We discuss the First Amendment basis for the ministerial exception here only as an explanatory introduction to our ministerial exception analysis.

**[2]** Yet "even in pursuit of a compelling state interest, the balancing test contemplates that some statutes may still have such an adverse impact on religious liberty as to render judicial review of a Church's compliance with the statute a violation of the Free Exercise Clause." *Werft*, 377 F.3d at 1102. The Free Exercise Clause mandates a ministerial exception for religious organizations in such circumstances. *See id.*

**[3]** As in the Title VII context, we next examine whether the Washington Minimum Wage Act implicates the Establishment Clause. We must determine: (1) whether the statute has a secular legislative purpose, (2) whether "its principal or primary effect advances . . . [ ]or inhibits religion," and (3) whether it "foster[s] an excessive government entanglement with religion." *Bollard*, 196 F.3d at 948 (quoting *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971)). The Minimum Wage Act has a secular purpose—to ensure minimum pay for all Washington workers—and it neither advances nor inhibits religion. It is the third factor, entanglement, that is at issue here. *Cf., e.g.*, *Elvig*, 375 F.3d at 956 (noting this in the Title VII context).

**[4]** Entanglement has substantive and procedural components. *Bollard*, 196 F.3d at 948. "On a substantive level, applying [a] statute to the clergy-church employment relationship creates a constitutionally impermissible entanglement with religion if the church's freedom to choose its ministers is at stake." *Id.* at 948-49. As for the procedural dimension, the very process of civil court inquiry into the clergy-church relationship can be sufficient entanglement. *Id.* at 949. "It is not only the conclusions that may be reached by [the court] which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions." *NLRB v. Catholic Bishop of Chi.*, 440 U.S. 490, 502 (1979).

**[5]** The Religion Clauses thus compel a ministerial exception from neutral statutory regimes that interfere with the

church-clergy employment relationship. Because the ministe-
rial exception is constitutionally compelled, it applies as a
matter of law across statutes, both state and federal, that
would interfere with the church-minister relationship. *See
Werft*, 377 F.3d at 1100 n.1 ("Because the ministerial excep-
tion is based in the First Amendment, we make no distinction
between the various federal and state law claims."); *Bollard*,
196 F.3d at 950. Therefore, we must analyze Rosas's claim to
overtime wages under the ministerial-exception rubric.

IV

**[6]** Because the ministerial exception analysis applies to
the Washington Minimum Wage Act, Rosas's claim is barred
if he is a "minister" and application of the statute would inter-
fere with a protected employment decision.[5] Rosas argues that
the district court erred in dismissing his claim for three rea-
sons. First, he argues the ministerial exception has an addi-
tional "actual burden" requirement. Second, he contends that
requiring the Catholic Church to pay overtime wages does not
implicate a protected employment decision. And third, he
maintains that the district court could not have determined
that he was a "minister" on the pleadings. We address and
reject each of these arguments in turn.

A

**[7]** Rosas first argues that the district court should not have
dismissed the case absent a determination that requiring the

---

[5]We examine here the constitutionality of Washington's Minimum
Wage Act as applied to Rosas's overtime claims. Federal Rule of Appel-
late Procedure 44 requires a party challenging the constitutionality of a
state statute to notify the state where the state is not a party to the proceed-
ing. Rule 44 was satisfied here when we, sua sponte, provided notice of
the constitutional question to the state and at oral argument, defendants'
counsel represented that defendants had contacted Washington's Attorney
General and that the state had indicated that it did not intend to intervene.
*See Zehner v. Trigg*, 133 F.3d 459, 461 (7th Cir. 1997).

Catholic Church to pay Rosas overtime wages would actually burden the Church's beliefs. Rosas cites *Tony & Susan Alamo Foundation v. Secretary of Labor* to argue that "the First Amendment does not shield religious organizations from [employment laws] unless, at a minimum, compliance actually burdens the free exercise of religion, or results in excessive government entanglement with religion." 471 U.S. 290, 303 (1985). We have never held—nor has any other circuit— that *Alamo* adds an actual burden element to the ministerial exception. The exception was created because government interference with the church-minister relationship *inherently* burdens religion.

The Supreme Court has not explicitly addressed the ministerial exception, but the Court's pre-*Alamo* decisions recognize that the First Amendment strongly circumscribes legislative and judicial intrusion into the internal affairs of a religious organization. *See, e.g.*, *Serbian E. Orthodox Diocese for the U.S. & Can. v. Milivojevich*, 426 U.S. 696, 721-23 (1976). The Court holds the church-minister relationship especially inviolate. Specifically, *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America* holds that a religious organization's freedom to select its clergy is protected under the Free Exercise Clause. 344 U.S. 94, 116 (1952). "Because the appointment [of clergy] is a canonical act, it is the function of the church authorities to determine what the essential qualifications of a chaplain are and whether the candidate possesses them." *Id.* at 116 n.23 (citation omitted). *Alamo* deals only with lay employees, and its holding is specifically premised on the fact that the challenged statute applied only to "commercial activities undertaken with a 'business purpose.' " *Alamo*, 471 U.S. at 305. The opinion therefore does not cast doubt on the Supreme Court's earlier decisions. Rosas's argument under *Alamo* is a lost battle.[6]

---

[6]Rosas also cites several cases for the proposition that various circuit courts have applied the labor laws to religious organizations. These cases are irrelevant because they applied the labor laws only to *lay employees* in religious institutions.

B

Rosas's second argument is no more availing than the first. He argues that the decision whether to pay him overtime wages "is not the sort of religious practice the First Amendment shields from secular examination." He reads *Werft* and *Bollard* to apply the ministerial exception only when a statute "would interfere with a church's freedom to either (a) 'choose its ministers,' or (b) 'practice its beliefs.' " *See* Appellant's Br. at 15 (citing *Bollard*, 196 F.3d at 944). We reject this argument for two separate reasons.

**[8]** First, this case *does* involve the Catholic Church's selection of its ministers. Rosas admits that "[a]s *part of [his] preparation for ordination* into the priesthood, *the Catholic Church required* [him] to engage in a ministerial placement." (emphasis added). This case thus quintessentially follows *Bollard*'s explanation that the "Free Exercise Clause rationale for protecting a church's personnel decisions concerning its ministers is the necessity of allowing the church to choose its representatives using whatever criteria it deems relevant." 196 F.3d at 947.

**[9]** Second, Rosas interprets our case law too narrowly. *Bollard* refers not only to the selection of ministers but more broadly to "employment decisions regarding . . . ministers." *Id. Bollard* acknowledges:

> Just as the initial function of selecting a minister is a matter of church administration and government, so are the *functions which accompany such a selection[, including] the determination of a minister's salary*, his place of assignment, *and the duty he is to perform* in the furtherance of the religious mission of the church.

*Id.* (emphases added) (quoting *McClure v. Salvation Army*, 460 F.2d 553, 559 (5th Cir. 1972)). The ministerial exception

encompasses all "tangible employment actions" and disallows lawsuits for damages based on "lost or reduced pay." *Elvig*, 375 F.3d at 964, 966. Such damages would "necessarily trench on the Church's protected ministerial decisions." *Id.* at 966.

C

**[10]** Finally, Rosas argues that even if a minister's salary is insulated from judicial scrutiny, the district court could not have determined on the pleadings that Rosas was a minister. He urges us to adopt a test set forth by the Fourth and D.C. Circuits that looks at the "primary duties" of employees to determine whether they are "ministers." *See EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 463 (D.C. Cir. 1996); *Rayburn v. Gen. Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1169 (4th Cir. 1985). He argues that under that test, because his complaint states that he "was hired to do maintenance of the church and also assisted with Mass," the district court could not have found on the pleadings that Rosas's *primary* functions at St. Mary were religious. Rosas more simply states: "On appeal, this Court need only consider whether, on the basis of the allegation above, Mr. Rosas mostly cleaned sinks or mostly counseled parishioners."

We have never clearly announced a test to determine whether an employee is a "minister" under the ministerial exception. In *Bollard*, *Elvig*, and *Werft*, we assumed the plaintiffs were ministers. In *EEOC v. Pacific Press Publishing Ass'n*, 676 F.2d 1272, 1278 (9th Cir. 1982), *abrogated on other grounds as recognized by American Friends Service Committee Corp. v. Thornburgh*, 951 F.2d 957, 960 (9th Cir. 1991), and *EEOC v. Fremont Christian School*, 781 F.2d 1362, 1369-70 (9th Cir. 1986), we looked at the functions of the employees to determine that they were not ministers. But in *Pacific Press*, we noted that "[t]he facts of the present case do not require this court to examine in depth the scope of the [ministerial] exemption," 676 F.2d at 1278, and in *Fremont*,

we similarly were not presented with an opportunity to consider the ministerial exception's scope, 781 F.2d at 1369-70.

It is true that we use a functional approach to the ministerial exception, which examines the "function of the position" rather than relying solely on ordination or "categorical notions of who is or is not a 'minister.' " *Elvig*, 375 F.3d at 958 n.3 (quoting *EEOC v. Roman Catholic Diocese of Raleigh*, 213 F.3d 795, 801 (4th Cir. 2000)). Under the functional approach, a lay employee can act as the functional equivalent of a minister. *See, e.g.*, *Roman Catholic Diocese of Raleigh*, 213 F.3d at 805 (concluding church's director of music ministry and part-time teacher at church's school fell under ministerial exception). And alternatively, "[w]hile religious organizations may designate persons as ministers for their religious purposes free from any governmental interference, bestowal of such a designation does not control their extra-religious legal status." *EEOC v. Sw. Baptist Theological Seminary*, 651 F.2d 277, 283 (5th Cir. 1981); *see Fremont*, 781 F.2d at 1369-70 (determining that teachers at a parochial school were not functionally ministers despite the defendant's contentions).

Although we reaffirm the importance of the functional approach, we find the "primary duties" test problematic. If taken literally, the primary duties test would require the district court to examine the number of hours Rosas spent on maintenance and the number of hours he performed religious duties. This could create the very government entanglement into the church-minister relationship that the ministerial exception seeks to prevent. *See Bollard*, 196 F.3d at 949; *see also Catholic Bishop of Chi.*, 440 U.S. at 502.

**[11]** Moreover, the underlying premise of the primary duties test—that a minister must "primarily" perform religious duties—is suspect. A religious organization can constitutionally require its ministers or ministers-in-training to spend a year volunteering in urban areas in the United States.

Similarly, a religious organization can constitutionally require its ministers to take a vow of poverty. So too, here, could the Catholic Church require its candidate for the priesthood to spend a year "mostly clean[ing] sinks" without overtime pay. We decline Rosas's invitation to adopt the Fourth and D.C. Circuits "primary functions" test.

**[12]** Instead, we adopt a test similar to the Fifth Circuit's and hold that if a person (1) is employed by a religious institution, (2) was chosen for the position based "largely on religious criteria," and (3) performs some religious duties and responsibilities, that person is a "minister" for purposes of the ministerial exception. *See Starkman v. Evans*, 198 F.3d 173, 176 (5th Cir. 1999).[7]

This test preserves the functional approach and recognizes that "ministers" generally perform religious ceremonies and duties. But it rejects the arbitrary 51% requirement implicit in the "primary duties" test, acknowledging that secular duties are often important to a ministry. Additionally, avoiding the "primary" requirement enables a district court to determine who is a "minister" earlier in the proceedings and minimizes

---

[7]The Fifth Circuit in *Starkman* provided a slightly different test. Under *Starkman*, to determine whether a person is a minister under the ministerial exception, the Fifth Circuit considers: (1) "whether employment decisions regarding the position at issue are made 'largely on religious criteria' "; (2) "whether the plaintiff was qualified and authorized to perform the ceremonies of the Church"; and (3) whether the plaintiff "engaged in activities traditionally considered ecclesiastical or religious." 198 F.3d at 176. Our first factor—requiring employment by a religious institution—is implied in the Fifth Circuit's opinion, and here we make this factor explicit. Also, the Fifth Circuit's second and third factors blend together. In holding that the plaintiff in *Starkman* was "qualified and authorized to perform the ceremonies of the Church" under the second factor, the court relied on the fact that she "had several religious duties and responsibilities," *see id.*, which is the Fifth Circuit's third factor. Because these factors merge under the Fifth Circuit's test, we combined them in our third factor. Thus, although we have formulated our test slightly differently, our analysis is in line with that of the Fifth Circuit.

the procedural entanglement of a detailed factual determination about "primary duties." *See Catholic Bishop of Chi.*, 440 U.S. at 502. And, of course, the district court retains the flexibility to determine whether a religious institution's designation of a person as a "minister" is mere subterfuge. *See Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1039 (7th Cir. 2006).

**[13]** The district court correctly dismissed this case on the pleadings under this test. Federal Rule of Civil Procedure 12(c) requires the district court to accept the factual allegations in the complaint as true. Rosas's complaint demonstrates that Rosas was a minister for purposes of the ministerial exception. First, Rosas was participating in a "training/pastoral ministry program" at a religious institution—St. Mary Catholic Church. Second, Rosas's position was largely based on religious criteria—it was a ministerial placement open only to seminarians. Third, he performed some religious duties by assisting in Mass. "It is without consequence that [Rosas] also may have performed many secular duties. [He] was not a secular employee who happened to perform some religious duties; [he] was a spiritual employee who also performed some secular duties." *Scharon v. St. Luke's Episcopal Presbyterian Hosps.*, 929 F.2d 360, 362 (8th Cir. 1991). The district court correctly dismissed the case on the pleadings because requiring the Catholic Church to pay overtime wages to Rosas would interfere with the Church's employment decisions regarding its minister. Rosas's claim is thus barred by the Free Exercise Clause and the Establishment Clause of the First Amendment.

**AFFIRMED.**