**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ALEXANDER BEHREND, | No. 23-15399 |
| *Plaintiff-Appellant*, | D.C. No. 3:21-cv-01905-JSC |
| v. | |
| SAN FRANCISCO ZEN CENTER, INC., | OPINION |
| *Defendant-Appellee*. | |

Appeal from the United States District Court
for the Northern District of California
Jacqueline S. Corley, District Judge, Presiding

Argued and Submitted April 3, 2024
Pasadena, California

Filed July 17, 2024

Before: Ryan D. Nelson, Lawrence VanDyke, and Gabriel
P. Sanchez, Circuit Judges.

Opinion by Judge VanDyke

# SUMMARY[*]

## Employment Discrimination / Ministerial Exception

Affirming the district court's grant of summary judgment to San Francisco Zen Center in an employment discrimination action under the Americans with Disabilities Act, the panel held that plaintiff Alexander Behrend's role as a "Work Practice Apprentice" fell within the First Amendment's ministerial exception.

The ministerial exception exempts a church's employment relationship with its ministers from the application of employment statutes such as the Americans with Disabilities Act. The panel held that it was required to take all relevant circumstances into account and to determine whether Behrend's position implicated the fundamental purpose of the exception, which is to ensure the independence of religious institutions in matters of faith doctrine and church government. The panel concluded that, even though Behrend performed mostly menial work, the work itself was an essential component of Zen training, and he therefore played a role in carrying out the Center's mission. The panel concluded that precedent foreclosed the view that only teachers and faith leaders qualify for the ministerial exception.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## COUNSEL

Jim Davy (argued), All Rise Trial & Appellate, Philadelphia, Pennsylvania; Kyle Quackenbush, Girard Sharp LLP, San Francisco, California; for Plaintiff-Appellant.

Eileen R. Ridley (argued) and Evan L. Hamling, Foley & Lardner LLP, San Francisco, California; Sara A. Levine Abarbanel, Foley & Lardner LLP, San Diego, California; for Defendant-Appellee.

## OPINION

VANDYKE, Circuit Judge:

The ministerial exception protects the "freedom of a religious organization to select its ministers." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 188 (2012). Alexander Behrend, who lived and worked at San Francisco Zen Center (the Center) as a Work Practice Apprentice (WPA), argues that he was not a minister. But the exception broadly ensures that religious organizations have the freedom to choose "who will preach their beliefs, teach their faith, and carry out their mission." *Id*. at 196. Behrend's role as a WPA clearly fits that broad exception, so we affirm the district court's grant of summary judgment.

## I.

The Center is the largest Sōtō Zen Buddhist temple in North America. It was formed to "encourage the practice of Zen Buddhism by operating one or more religious practice facilities and educating the public about Zen Buddhism."

Sōtō Zen Buddhism "involves bringing one's practice wholeheartedly into the present moment, into the normal activity of one's daily life." "Work itself is an essential component of Zen training and is indistinguishable from other forms of practice." The Center offers several "types of programs for individuals interested in learning about and training in Zen Buddhism," including some programs for the general public and some for individuals who reside at the temple "full time … as monks."

The Center operates three residential programs that build on each other. First, an individual can be a "guest student" who lives at the temple for two to six weeks. Second, an individual can be a WPA for a two-to-three-year residency. Third, an individual who completes a Work Practice Apprenticeship can be staff at the temple as a continuation of Zen training.

The Center explains that the WPA program is "the launch and the foundation for [the apprentice's] Zen training." An individual can apply to be a WPA after completing at least two weeks as a guest student. "WPAs follow a strict practice schedule of formal and work practice." Formal practice includes morning and evening meditations and services, soji (temple cleanings), dharma talks, classes, and a range of other events. Work practice includes things like cooking, dishwashing, cleaning, and "doan ryo ceremonial tasks 'which support the formal practice, such as ringing bells, cleaning altars, and watching the door during zazen meditations.'"

Alexander Behrend became involved with the Center in 2014 after he was in a car accident that left him with physical disabilities and PTSD. Behrend initially volunteered with the Center's food outreach program, and then in 2015 he

began attending meditations a few times a week and participating in the "Saturday sangha," a group of nonresidents who volunteered and listened to a dharma talk (a talk about the precepts of the faith). He initially was not interested in adopting a new religion, but he eventually "considered himself a practicing Zen Buddhist."

Following his car accident, Behrend was unable to remain in his prior employment and therefore unable to afford his apartment. In 2016, he spoke with the Center's head of practice because he was given a one-month notice of losing his housing. He then applied and was accepted as a guest student in November 2016. In January 2017, he was accepted as a WPA, where he received room and board at the center and a small stipend.

Behrend's schedule as a WPA included meditation, lunch with other students, dharma talks, and a range of work duties. His work duties began in guest services, where he checked guests in, prepared guest rooms and conference spaces, cleaned, answered guests' questions, and began each day praying with the guest services team. He then worked in the kitchen cooking and washing dishes, and again spent a few minutes each morning in front of an altar with the rest of the crew. Finally, Behrend was assigned to the maintenance crew in September 2018, but that work exacerbated his PTSD symptoms. Behrend sought accommodations, including moving off the maintenance crew, but eventually the Center "made a decision to end [his] participation in the Program."

Behrend sued for disability discrimination under the Americans with Disabilities Act (ADA) in the Northern District of California, and the Center moved for summary judgment on its affirmative defense under the First

Amendment's ministerial exception.  The district court granted the Center's motion, determining that no party disputed that the Center is a religious organization and the undisputed facts established that Behrend fit within the ministerial exception.  Behrend now appeals, arguing that he was not a minister because he performed mostly menial work and did not have a "key role in making internal church decisions and transmitting the faith to others."

## II.

"We review the grant of summary judgment de novo, viewing the evidence and drawing all reasonable inferences in the light most favorable to the non-moving party." *Edwards v. Wells Fargo & Co.*, 606 F.3d 555, 557 (9th Cir. 2010).

## III.

The ministerial "exception exempts a church's employment relationship with its 'ministers' from the application of some employment statutes, even though the statutes by their literal terms would apply." *Alcazar v. Corp. of the Cath. Archbishop of Seattle*, 627 F.3d 1288, 1290 (9th Cir. 2010) (en banc).  The exception is grounded in both religion clauses of the First Amendment.  "The Establishment Clause prevents the Government from appointing ministers, and the Free Exercise Clause prevents it from interfering with the freedom of religious groups to select their own."  *Hosanna-Tabor*, 565 U.S. at 184. "Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, … interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs."  *Id*. at 188.  So "[t]he ministerial exception was recognized to preserve a church's

independent authority" "to select, supervise, and if necessary, remove a minister without interference by secular authorities." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 747 (2020).

Behrend argues on appeal that the exception only covers those with "key roles" in preaching and transmitting the faith to others. But precedent from our court and the Supreme Court evinces a much broader rule that covers positions like his.

### A.

To start, there is no "rigid formula for deciding when an employee qualifies as a minister." *Hosanna-Tabor*, 565 U.S. at 190. In *Hosanna-Tabor*, the Court considered whether the exception applied to a "called" teacher at a Lutheran school who was commissioned by the Church after completing a special religious teaching program, and who taught elementary school math, language arts, social studies, gym, art, music, and religion to her students. *Id.* at 178. Even though only a small part of her day was spent actually teaching religion, the Court determined the exception applied, considering "all the circumstances of her employment." *Id.* at 190. The Court found relevant that she was given a formal title by the Church, that she held herself out as a minister, and that she received the title after "a formal process of commissioning." *Id.* at 191. Also important was that her job duties "reflected a role in conveying the Church's message *and carrying out its mission*." *Id.* at 192 (emphasis added).

In *Our Lady of Guadalupe*, the Court considered whether the exception applied to two other elementary school teachers, this time at Catholic schools. The teachers were not "called" or commissioned by the Church and did not

receive extraordinary training from the Church, but they were required to teach religion and pray with their students. 591 U.S. at 738–44.  Again, the Court determined that the exception applied, reemphasizing that there was no "rigid formula" and instead "a variety of factors may be important."  *Id*. at 750–51.  The Court explained that the considerations in *Hosanna-Tabor* were "relevant because of their relationship to [the teacher's] 'role in conveying the Church's message and carrying out its mission,' but the other noted circumstances also shed light on that connection."  *Id*. at 752 (internal citation omitted) (quoting *Hosanna-Tabor*, 565 U.S. at 192).

In analyzing whether someone falls within the ministerial exception, our role as a court is to "take all relevant circumstances into account and to determine whether each particular position implicated the fundamental purpose of the exception."  *Id*. at 758.  That purpose is to ensure "[t]he independence of religious institutions in matters of 'faith[,] … doctrine,'" and "church government." *Id*. at 746.  While titles and learning requirements might be relevant, "[w]hat matters, at bottom, is what an employee *does*."  *Id*. at 753 (emphasis added).  For schools like those in *Hosanna-Tabor* and *Our Lady of Guadalupe*, "[e]ducating and forming students in the [religious] faith *lay at the core of the mission*," and so the teachers "performed vital religious duties."  *Id*. at 756 (emphasis added).

Here, the ministerial exception protects the Center's ability to determine who may serve in its WPA program. While Behrend argues that he was not a minister because, as a WPA, he performed mostly menial work, there is no genuine dispute that "[w]ork itself is an essential component of Zen training and is indistinguishable from other forms of practice."  And a Work Practice Apprenticeship is "the

launch and the foundation for [the apprentice's] Zen training." Behrend, as a WPA, surely had a "role in carrying out [the Center's] mission," *Hosanna-Tabor*, 565 U.S. at 192; *Our Lady of Guadalupe*, 591 U.S. at 756–57.

### B.

Behrend argues to the contrary that the ministerial exception does not apply because his role as a WPA "was not key to [the Center's] ability to preach and transmit their faith to others." In his view, only teachers and leaders of the faith qualify for the exception. But precedent clearly forecloses that view, and for good reason.

First, in *Our Lady of Guadalupe*, the Supreme Court specifically addressed whether such a role is required. 591 U.S. at 758 n.26. The Court explained that *Hosanna-Tabor* "did not suggest that the exception it recognized applied only to 'leaders.'" *Id*. And while *Our Lady of Guadalupe* and *Hosanna-Tabor* emphasized the plaintiffs' roles as teachers of their faith, that was because the plaintiffs in those cases *were teachers*. It makes sense to emphasize an individual's role in sharing the message with another generation of believers when that is the role she plays in the church. But *Hosanna-Tabor* and *Our Lady of Guadalupe* did not do so at the exclusion of those whose roles in a church may not include overt teaching. *See id*.

Second, our own precedent does not reflect the circumscribed view of the ministerial exception urged by Behrend. *See Alcazar*, 627 F.3d at 1292. In *Alcazar*, we applied the exception to a Catholic seminarian who, while studying to become a priest, was not yet ordained and was not teaching the faith to others. Instead, he "was hired [by a church] to do maintenance of the church and also assisted with Mass." *Id*. We concluded that the exception applied

because he did this work "as part of his seminary training," even though he was not yet a teacher or a leader in that church. *Id.*

Both our precedent and that of the Supreme Court proscribe a rule by which only those who are high up in a religious organization can qualify as ministers. This makes sense: if leadership was a requirement, cloistered nuns or monks might very well be disqualified. *Our Lady of Guadalupe*, 591 U.S. at 758 n.26 (questioning whether under that view a rabbi or clergy member who "spends almost all of his or her time studying Scripture or theology and writing instead of ministering" would fall outside the exception). Since the purpose of the exception is to ensure a religious organization's independence in matters of faith, doctrine, and government, surely it applies just as readily to those who perform vital, but not necessarily hierarchical, functions.

Take, for example, a Catholic acolyte whose job is "to serve at the altar and to assist the priest and deacon."[1] Such a person provides an extra set of hands to the priest or deacon during Mass by "prepar[ing] the altar and the sacred vessels, and … distribut[ing] the Eucharist to the faithful[.]"[2] He has no role in leading the congregation and generally does not speak at all during Mass, let alone teach. But surely the ministerial exception allows a Catholic church to determine for itself who can and cannot serve at the altar.

The Center's WPA program, while perhaps not as familiar to many, is no less protected. Behrend was tasked

---

[1] *See* U.S. Conf. of Cath. Bishops, *General Instruction of the Roman Missal* ch. 3, § 98 (2011), https://www.usccb.org/prayer-and-worship/the-mass/general-instruction-of-the-roman-missal.

[2] *Id.*

with performing maintenance, kitchen, and guest services. But he was also responsible for assisting with rituals, participating in meditations and services, cleaning the temple, attending talks and classes, and performing doan ryo ceremonial tasks like ringing bells and cleaning altars. He lived and worked full time at the temple as a monk. While Behrend may not have taught and was not a part of the hierarchical leadership structure, he "performed vital religious duties" as part of the Center's WPA program. *Our Lady of Guadalupe*, 591 U.S. at 756.[3] In short, were the court to adopt a rule like the one Behrend suggests, we would be "interfering with the freedom of religious groups to select" who may or may not serve as a live-in monk. *Hosanna-Tabor*, 565 U.S. at 184. The purpose of the ministerial exception, to ensure "[t]he independence of religious institutions" in matters of faith, doctrine, and government would not be served by such a rule. *Our Lady of Guadalupe*, 591 U.S. at 746.

## IV.

The religion clauses of the First Amendment give the Center the freedom "to select, supervise, and if necessary, remove a minister without interference by secular authorities." *Id*. at 747. Because Behrend had a "role in … carrying out [the Center's] mission," he qualifies for the

---

[3] In light of the entanglement concerns that undergird the ministerial exception, the Supreme Court has emphasized that "[a] religious institution's explanation of the role of such employees in the life of the religion in question is important." *Our Lady of Guadalupe*, 591 U.S. at 757. We therefore defer to the Center's view that Behrend's duties are, by nature, religious. *See generally Bollard v. California Province of the Soc'y of Jesus*, 196 F.3d 940, 947 (9th Cir. 1999) (a religion's "choice of representative" is "a decision to which we would simply defer without further inquiry").

ministerial exception. *Hosanna-Tabor*, 565 U.S. at 192; *Our Lady of Guadalupe*, 591 U.S. at 752. Therefore, the district court properly granted summary judgment based on the ministerial exception.

**AFFIRMED.**